We'll call up the next case of Harris versus KBR. I won't say exactly for me that it's déjà vu all over again, but the matter has been before this court previously in another stage. Mr. Stickman. Yes, Your Honor. May it please the court, Your Honors, William Stickman on behalf of the appellants Douglas Maseth and Sherry Harris, the parents and administrators of the estate of Staff Sergeant Ryan Maseth. I would ask, Your Honors, if I may request a rebuttal time of three minutes. Granted. Your Honors, the district court erred both in its interpretation of the political question doctrine applied to this case and in its interpretation of the application of sovereign immunity to KBR. Mr. Stickman, I find this a really difficult case. I mean, the more I think about this case, the more complex it seems and the more questions I begin to ask myself. And some of them have been, are implicated in the first question I'm going to ask you, because it may or may not drive where we go in this case. Shouldn't our analysis this time around focus on whether there is a viable theory of liability under state law, under a state's law, that allows a court to avoid reconsidering military decisions? Yes, Your Honor. All right. So what is your theory of liability here under what state or state's law? Under which state law should apply to this? Well, the district court already decided in March of 2012 in denying KBR's application to apply Iraqi law that under the — Does Iraq have a tort system? It does, Your Honor. And this issue was fully developed and decided by the district court. What happened there was KBR attempted to have Iraqi law apply. The district court applied Pennsylvania choice of law principles. The federal court sitting here applies Pennsylvania choice of law principles. But did the district court do more than determine that Iraqi law did not apply? It determined that — The court is required to apply Pennsylvania principles and purposes in determining what state does. It determined that Iraqi law did not apply. All right. So at this point, though, we still don't know, do we, whether Pennsylvania law, Tennessee law, or Texas law applies? That is correct. But what we — Doesn't that make a difference? As to the narrow negligence claims that the appellants have proffered in their complaint, and as to the way those claims would be proven, it does not make a difference. It would be a false conflict. When this cause of action arose, did Pennsylvania still have joint and several liability? It did. Isn't there a difference between Pennsylvania tort law and what Tennessee and Texas law is in that regard? Well, the issue of joint and several liability, Your Honors, applies to parties or to claims where there are multiple defendants. And in this case — Right. And only defendants, right? It only applies — Named parties. That's correct. It only applies — Is that the law in Tennessee and Texas? I believe, Your Honor, that in each of those jurisdictions — and this is something that is — I'm jogging my memory here from a year and a half ago. But it's pretty important here, isn't it? It is, but — Because that's going to drive not only liability, but proofs as well. Well, Your Honor, the district court, in its first decision on this case, and the various circuits who have examined it, the 11th Circuit, for example, in the Lane case and in the McMahon case, understood that KBR fully intends to present the open shared defense. And it said that tort law — the provisions of tort law are more than flexible enough to permit KBR to point to the empty chair and for the court and a jury, ultimately, to determine where liability should fall. Isn't that a problem for you, especially under Tennessee and Texas law? No, I don't believe it is a problem. And here's why, Your Honor. I think that if you examine the claims of negligence raised against KBR, those claims — What are they? It is that — What is your theory of liability? Our theory of liability, Your Honor, is that on multiple occasions, KBR was called to Staff Sergeant Mathis' facility. We believe there were over a dozen work orders. I don't want the facts. I want stated in legal jargon, if you will, what your theory of liability is. I thought that it was that KBR negligently performed the duties assigned to it by the military by failing to complete its work at the standard set by the military. No. Am I wrong about that? The claim that we make is that KBR was negligent in its performance of electrical services at LSFB1. And it's important, though, to look at the fact under which it worked, because that goes to the second half of your comment there, Your Honor. The record demonstrates that KBR was given a contract by the military, and that was a Level B contract, meaning that KBR couldn't institute new work on its own. It had to be called by the military. It's important to note in this case that on multiple occasions, KBR was, through a work order, called to the facility to perform work under a work order. The record demonstrates that to the extent that KBR believed that the work was within the scope of its contract, it was permitted to do it. If it didn't believe that, it was required to approach the military and explain that fact. In no circumstances does the record reflect that KBR ever objected to a work order being outside its scope. Mr. Stickman, again, I understand the position. Those are arguing facts in support of a specific theory of liability. But getting back to inquiries that seem to me to be critical to the political question doctrine question here or its applicability, KBR has argued, have they not, that your client would not be entitled to recovery because Sergeant Messif was contributorily negligent. They've argued that Staff Sergeant Messif assumed the risk of the- I thought they argued both. I thought they were arguing both assumption of risk and contributory negligence. I believe- Maybe I'm incorrect and they can clarify. It's my understanding of the record as I stand here, Your Honor, that they argued assumption of the risk. And that's what the trial court examined when looking at KBR's defenses. But the assumption of the risk argument, like all of our claims, doesn't second guess a military decision. It merely asks, as to Staff Sergeant Messif's appreciation of the risk, as a matter of fact, what did he believe and what risk did he assume when taking a shower? Now, on a factual basis, this demonstrates, again, that that can be viewed narrowly in the scope only of what KBR actually did, and that KBR itself admits that there were alternate showering facilities available. I also argued causation. They do argue- KBR also argues causation. They do. Now, the- Let's take a- They're arguing, look, it wasn't our fault. It was the military's fault. They wouldn't give us a maintenance A contract. We were only a B contractor. We knew about that.  They apparently didn't have enough money. KBR made that argument. But the way that that argument does not imply the political question doctrine is because the record demonstrates that KBR actually performed work under Level B, and at no time when KBR performed work under Level B at the facility did KBR say, this is outside the scope of our contract. So what plaintiffs have done is have retained two experts, electrical engineers and an actual electrical inspector that inspected the- If KBR is able to argue that the military's housing and maintenance decisions were a proximate cause, a proximate cause of Sergeant Mayseth's death, then how would a court determine compensatory damages? How would it estimate compensatory damages without considering military decisions? Well, and let me couple to that, how do we do that if we don't know whether we're dealing with a jurisdiction that has joint and several liability or a jurisdiction that applies some kind of proportional liability? I'll answer that question in two phases, first being the question of the causation. The causation of this case is KBR is free to point to the military as being a factor, but ultimately KBR can't hide from the fact that KBR performed work at the facility, and KBR as performing the work in the facility had to do so under a standard reasonably required by general standards of negligence, and also we believe the contracts demonstrate specific standards. Now they can point as a matter of fact that the military gave us a variety of parameters that we had to work within, but as the Solicitor General of the United States pointed out in the Carmichael decision, that was a convoy case, it's possible for a court to take all of the military's decisions and all of the contractual restrictions and the circumstantial restrictions as external factors to be taken as a given, and the only question remaining for the court is whether the contractor, KBR in this instance, in light of all those factors was negligent. We've deduced evidence that they were. As to the apportionment factor, as the various circuits have held, both Lane and the McMahon case, the civil justice system is more than well equipped to deal with apportionment of liability under a variety of circumstances. Isn't this case a lot like the Taylor case out of the Fourth Circuit, and was that case properly decided? We would argue that case was not properly decided. I think Mr. Stickman knows Taylor pretty well, so whether it's properly decided, he probably has a view of it. We would argue that case is not properly decided. In the continuum of cases where a political question may apply, perhaps a Carmichael on this side, and our case may sit here, Taylor is on the side where it should not. But there's one distinction that's key, and I think that the lead opinion explained this. In Taylor, as opposed to here, there was simultaneous action by the military in the various circumstances leading to the plaintiff's injuries. In our case, the record reflects that when they were given a work order, KBR had almost plenary authority to diagnose the problem, to prescribe a fix for the problem, and to do so. And in each instance here, KBR marked the work orders as complete. So the only question that we ask, Your Honors, is when KBR was performing, within its circumstances, taken as an external given, like the Solicitor General said, was KBR negligent? That is not a question of statecraft constitutionally committed to the halls of Congress or the executive. That's a question of fact. It's a question that would be determined by a battle of experts. And if their expert prevails upon a jury, and a jury believes that we think that KBR's hands were tied by the military or its contract, we simply lose. We're not a – All right. We're talking, first of all, the district court cited two reasons not to proceed further and to grant the motion to dismiss. The political question doctrine and the combatant's activity defense. On the political question doctrine, I want to try to pin you down here at least on one point. Do you acknowledge that in deciding whether or not this is a political question, we have to look at what the defenses are that KBR is going to propose to your claim? I do acknowledge that. And may I continue with my red lights on? Okay, I acknowledge that. But when you look at those defenses, you have to look at them in two ways. One is do those defenses actually call into question – Okay, but you acknowledge that we have to evaluate the defenses. That's black letter law, Your Honor. Okay. That was the predicate of my questions to you of relative to liability under various state laws. Because I'm having difficulty here, Mr. Stickman, trying to figure out how we decide this case without knowing what applicable state law applies. Shouldn't we actually remand this case to the district court to allow the district court to tell us so we know what kind of a liability regime we're proceeding under? That will have profound implications for how this case goes forward and if this case goes forward. That would be an option. And I believe if you read the district court's opinion, the district court stated that it interpreted it under the guise of Pennsylvania law because it had withheld the decision going forward as to which state law applies. Thank you. We'll have you back on rebuttal, Mr. Stickman. Mr. Ebner? Am I incorrect? Did you not raise a defense of contributory negligence and only a defense of assumption of risk? We raised ñ well, good morning, first of all. I'm Larry Ebner. Sorry. That was rather rude of me. I apologize. Larry Ebner and I represent the Appley KBR. We've raised three defenses, three threshold defenses, proximate causation, assumption of risk, and contributory negligence. And let me just start by saying that the appellants cannot win this appeal by arguing the merits of their claims. The whole purpose of the political question doctrine and of combatant activities preemption is to determine whether a court can reach the merits of their claims. I agree with you. And they cannot. But isn't it critical, as my previous line of questions suggested, for this court to have some refinement of the plaintiff's cause of action or causes of action together with your defenses based upon whatever state court law regime they're based upon? I really don't think it matters which state's law applies in this case. It doesn't matter whether or not we're dealing with joint and several liability or proportional liability? The reason it doesn't matter, Your Honor, is because, as District Judge Fisher pointed out, in each of the three states, Pennsylvania, Tennessee, and Texas, a defendant can argue that it was not a proximate cause of the plaintiff's injury by arguing that the military was the sole proximate cause. And that's our argument here. Okay. So if you argue that, and since that's what I thought your argument was, you're saying it wasn't our fault in simple terms. It wasn't our fault. It was the military's fault. All right? Yes. Now, for a jury to determine whether or not it was your fault, do they have to look at anything that impacts the political question doctrine? Why do they have to? There's no reason to have to question the wisdom of what the military did. Because that's kind of turning, with due respect, it's kind of turning the political doctrine upside down. It is. And the reason for that, Your Honor. It's looking at it from the bottom up. Yes. And at this stage, what the court needs to do is satisfy itself that this case cannot be adjudicated without having a second-guess sense of military judgments. And doing that Why would there by necessity be any second-guessing of a military judgment if, in fact, all the question was, was it KBR's fault, or was there some intervening role that the military played? And if they did, without questioning the wisdom, but rather just considering that, to me that doesn't seem like that's a political question. Because the question of whether it was KBR's fault is a merits question, and that's exactly the type of the question that the political question, that's exactly the type of issue that the political question doctrine renders non-justiciable. There were at least three major important sensitive military judgments involved in this case. First, the U.S. military made the wartime judgment to knowingly expose But let me stop you right there, and I know what you're going to say. But the jury doesn't have to conclude whether or not that was correct or incorrect to make that willing determination that, look, we're going to put the soldiers in hardened barracks that may have some electrical malfunctions. The jury's not going to have to look at whether that was right or wrong. They're just going to have to look to say, was it KBR's fault, or was it the military's decision that led to Sergeant Massa's electrocution? Well, I believe that in the process of determining whether the military was the proximate cause. The proximate cause, the sole cause. Well, whether the U.S. military. Isn't that the argument you said? Yes, Your Honor. And if that is your argument, following Judge Fisher's, my colleague Judge Fisher's line here, then isn't resolution of whether the military was the sole cause simply a factual question, and about whether KBR installed the pump or performed maintenance on it? I mean, isn't that all that would have to be resolved? No, Your Honor. In order to determine whether the military was the sole proximate cause, a jury would have to probe the military's decisions in that offense of the political question doctrine. It has nothing to do with who installed the pump or what KBR did or didn't do with these work orders. That's the merits. And this Court doesn't have to be convinced that the military was the sole proximate cause in order to affirm District Judge Fisher's decision. What the Court needs to do is determine whether our liability defenses, proximate causation, assumption of risk, and contributory negligence necessarily implicate military decisions, decisions that the Constitution commits to the executive branch, decisions for which there are no judicial standards, and decisions which could not be adjudicated without showing lack of respect for the military. You're painting with a pretty broad brush here. Is there any tort claim at all that could be brought against you related to your work there that could not turn into a non-justiciable political question? Yes, Your Honor. If there were a – well, first of all, I think that it's very important to understand that going back to Baker versus Carr, the political question doctrine is determined on a case-by-case basis. A district court has to conduct a discriminating inquiry into the facts and posture of the case. That's exactly what District Judge Fisher did in her 87-page opinion. She did that by taking advantage of the evidence. When this Court in 2010 dismissed our collateral order appeal, the Court noted that this case raises important questions about the scope of the political question doctrine on combatant activities preemption, and that a better-developed record might lead to a renewed motion to dismiss. That's exactly what happened. There was full discovery, including thousands of pages of U.S. military testimony and documents. And based on that pretrial evidentiary record, an expansive record, District Judge Fisher determined that this case cannot be adjudicated, neither their claims or our liability defenses, without second-guessing military judgments. To answer your question directly, Judge Chikaris, if there were a situation, for example, where a contractor employee were driving around a military base intoxicated and ran over a soldier, I'm not sure that that type of situation, if the contractor were sued, would implicate sensitive military judgments. But that's quite different from what we have here, where we have General Vines, the commanding general of the multi-force corps in Iraq, testifying that they knowingly exposed thousands of soldiers to the risk of electrocution in hard-to-stand buildings. Look, you raised the argument about your drunken employee driving around the base. A contractor's drunken employee, yes. Okay, a contractor's drunk, not KBR's, but a contractor's. How is that any different than what the plaintiff might be arguing? And I'll stretch their case a little bit to say, a contractor running around these barracks knowing that they're in unsafe conditions and doing nothing about it. There's a crucial difference. And the crucial difference is that everything that KBR did in this case was squarely within the four corners of the contract. Indeed, they're alleging. Except you responded to work orders. We responded to work orders. And there's an allegation that there was a work order that would have directed your attention to the water pump on the building in question. Well, as the district court know that there was no work order. All right, that's a factual question. But, I mean, that's a factual question as opposed to a political question, doctor. That's exactly correct. It's a merits question that really doesn't pertain to the political question doctrine. But the posture of this case is such that the district court has granted your motion to dismiss on the basis that this whole dispute is consumed by the political question doctrine. That and combatant activities preemption, yes. Right, yes. But, and our question, my question at least is, is many of these factual disputes come within the example you gave of what would take a contractor outside of the political question doctrine. Now, whether or not the plaintiff ultimately prevails on this case in the merits isn't before us. Correct. It's the question as to whether or not you can go forward, whether they can go forward to get to the merits. Yes, and our contention is that this case cannot go forward. It cannot be adjudicated without running squarely into military judgments that would have to be probed. It would be impossible for a jury to determine. I guess I want to quarrel with your use of the word squarely. I think at best your case may be touching upon military judgments. Well, that may be one way to view it, but whether it's touching upon it or whether the judgments are squarely implicated, they are the predicate for our reliability defenses. Our proximate causation defense is predicated not on what the appellants call external facts, but on these key military judgments relating to the use of the hard stand buildings, relating to the classification of Sergeant Masath's building for level B maintenance, and also regarding the availability and use of abolition units. I mean, I'm obviously concerned about the plaintiff's claim in this case, but any decision we make in this case is going to come pretty close to virtually immunizing any contractors in situations that are anywhere similar to where KBR was in Iraq. Your Honor, I really don't think that's correct. In terms of the political question doctrine, because it's considered on a case-by-case basis and because Baker v. Carr states specifically that the political question doctrine is not susceptible to a categorization. And we made that point in our gross opinion as well. Yes, that's correct. So circling back to what Judge Smith said, whatever tort regime would apply, is it relevant to – should be relevant to our analysis? Let me – there's two reasons. It's irrelevant to both the political question and the combatant activities preemption. It's irrelevant to political question doctrine analysis because in any of those three states, we have the right to defend ourselves from liability by contending that a non-party, the United States, was the sole proximate cause. In Pennsylvania terms, the sole factual cause. With regard to combatant activities preemption, it's not sovereign immunity as appellants called it. It's a form of implied conflict preemption. And the question is, do these state tort claims, whether they arise under Pennsylvania law, Tennessee or Texas law, do those state tort claims significantly conflict with the purposes and objectives underlying the FTCA combatant activities exception? And our answer to that question is yes. So it really doesn't make a difference which state's tort law applies. What's your strongest case on the combatant activities exception? Our strongest case is probably Judge Silberman's opinion in the Saleh case, which involved the Abergrave prison situation, where he analyzed the preemptive effect of the combatant activities exception and actually described it as a type of battlefield preemption. The other strong case we have is the Aiello case, which was a Southern District of New York case. That was a situation where KBR was performing maintenance services at a forward operating base in Iraq, and the district judge explained why a seemingly ordinary slip and fall case was covered by combatant activities preemption. I'd also like to commend the Court to the dissenting opinions of Judges Wilkinson and Niemeyer in the Fourth Circuit Anbach-Alshamari decision. Mr. Ebner, in considering the combatant activities preemption issue, do I understand that you are advocating that we adopt the Solicitor General's proposed test? Yes, although our position is that we also meet the preemption formulation set forth in the D.C. Circuit Saleh opinion. All right. But we are advocating that the Court adopt the test, because this suit could not be brought directly against the United States. It would be barred by the combatant activities exception. And we certainly acted within the scope of the contract. In fact, the appellants are arguing that we breached the contract, so there's no outside the scope of the contract conduct involved here, which distinguishes this case from the drunken employee example that I gave. I see that my time is up. Wasn't there greater integration and control in both the Saleh and Aiello cases than you have here? In the Saleh case, yes, because of the nature of the activity. The contractor was providing in-prison interrogation and translation services. But in the Aiello case, it was factually similar to this case, in the sense that KBR was being directed by the military mayor's cell on a day-by-day, work order-by-work order basis, but there wasn't a soldier hovering over KBR physically at every moment of the day. Doing that would have defeated the whole idea behind this log cap contract, which was to free up soldiers to be war fighters. But there was certainly control, although our position is that, as in the Taylor case, control is not a prerequisite to application of the political question doctrine, because as the court pointed out in Taylor, KBR was nearly insulated from direct military control. All right. Thank you, Mr. Ebner. Thank you. Mr. Stickman, we'll have you back on rebuttal. Your Honors, I would like to rebut two key points that Mr. Ebner made. One is the test under the combatant activities exception under CELA, and the second that I'll get to is the view that you don't look at the merits in determining this motion to dismiss. As to the CELA case raised by Mr. Ebner, my learned opponent, CELA is completely different from this case. In that case, the D.C. Circuit explained that the contractors were operating in a manner that was fully integrated into the military operations being undertaken at Abu Ghraib to a point where they were soldiers in all but name. If you look at that case and what was happening there, it was almost as though the contractors were borrowed servants of the military themselves, and that the military not only controlled the general parameters of what type of work they wanted them to do, but the absolute manner in which they performed the work simultaneous with the military. Take this case, though. In this case, the military undoubtedly contracted with KBR to perform maintenance services, but the record is absolutely clear that when KBR received a work order, a service call to come out and perform it, unlike CELA, it wasn't fully integrated into the military source, and the military did not retain complete control over the specific manner of performance. That was left squarely and entirely in the discretion of KBR. As to the contention that we can't look at what the ultimate merits of this case are, we can only look at the political question doctrine in light of the claims that were raised, this court has recognized that under a Rule 12b-1 jurisdictional challenge, in many cases, it's necessary to look at the merits, because the merits are the facts which also have the dispositive effect on the court's jurisdiction. And this court explained that in such circumstances, because the protections of a 12b-6 motion aren't there, the plaintiffs are held to a lower standard in demonstrating that the court has jurisdiction than they would be at trial. And here... Doesn't it also affect who has the burden of going forward, whether we're talking about 12b-1 or 12b-6? It does. And because of that, this court has held recently in the SRP versus the United States case that the burden that the plaintiff is held to is less than that at trial. We believe that in this case, the district court fundamentally erred in holding the plaintiffs throughout its entire 12b-1 analysis to an untenably high standard. For example, at page 49 of the district court's opinion, the district court concedes that the plaintiffs have produced evidence which supports findings that KBR could have eliminated the risk of electrical shock in the context of the work orders which were submitted, and that KBR's failure to recognize the risk in the shower and eliminate in the context of those work orders approximately caused the harm to Staff Sergeant Masath. But the district court didn't hold us to a standard lower than what would be required at trial. It held us to, quote, a smoking gun evidence standard, a standard that is unheard of in Anglo-American jurisprudence, and that colored the entire way the court viewed the factual record in this case. This is nothing more than a case as to whether KBR was negligent when it did respond to work orders, not what could have happened. So we ask your honors to reverse the district court on both grounds. Thank you very much, Mr. Stickman, Mr. Edner. Thank you to both counsel for their assistance in this very interesting and very difficult case. Before we conclude and before we declare a recess, I'd like to acknowledge the presence of our good friend, Attorney Paul Titus, who I think is here with the class as he has been in the past. Am I correct, Paul? Yes, sir. Could you tell us something about your friends who have accompanied you here? This is the 8th grade class, the Sister Tia Bowman Ethics Academy, which was formed recently by the merger of Holy Rosary School and St. James School. It's run by the Diocese of Pittsburgh, funded largely through the Extra Mile Foundation. I'm very proud to work with them. Earlier this year, they tried a mock trial before Judge Woodruff, before Thomas Lee. He said it was the best group he had heard, and they did an outstanding job on that. Students who finish in these schools, your honor, almost 100% finish high school. Close to 90% go to post-high school. So it's a wonderful program, and there are a number of fellow lawyers who work with me with them. We're always pleased to be able to bring them to court and hear what's going on. We're pleased to have all of you here as guests, and I thank you for bringing them here, Attorney Titus. As a result of your experiences at Moot Court and the wonderful mentoring I'm sure you've received from others, including Attorney Titus, are there any of you who are thinking possibly about one day becoming a lawyer? Ah, some hands. Is there anyone here who has been discouraged in any way based on what you saw today from becoming a lawyer? I have one. I appreciate your candor. Again, we thank you for being here, and thank you, Paul. All right. With that said, we'll ask the clerk to recess the proceedings. Please rise.